IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELA J. P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 18-cv-1941-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for DIB in March 2014, alleging a disability onset date of May 13, 2011. After holding an evidentiary hearing, an ALJ denied the application on August 30, 2017. (Tr. 15-26). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted her administrative remedies and filed a timely complaint with this Court.

## **Issues Raised by Plaintiff**

Plaintiff raises the following issues:

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 14, 24.

1

1. The ALJ found fibromyalgia to be a severe impairment but did not provide any explanation of its role in the Residual Functional Capacity assessment.

2. The ALJ failed to adequately assess the medical opinions.

3. The ALJ's analysis of Plaintiff's subjective complaints is not based upon substantial evidence.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881,

886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity

3

since the alleged onset date. She was insured for DIB only through December 31, 2016. The ALJ found that plaintiff had severe impairments of degenerative disc disease, fibromyalgia, and obesity, which did not meet or equal a listed impairment. He also found that her mental impairments were not severe.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at the light exertional level, with nonexertional physical limitations consisting of (1) no climbing of ladders, ropes, or scaffolds; (2) only occasional climbing of ramps and stairs; and (3) occasional balancing, stooping, kneeling, crouching, and crawling.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. However, she was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1977 and was 39 years old on the date last insured. (Tr. 169). She said she was disabled because of bipolar disorder, severe anxiety and depression, and chronic pain in her knee and wrist. She was 5' 3" tall and weighed 170 pounds. She said she stopped working on May 13, 2011. She had past employment as a factory worker, a clerical worker, a laborer, and a restaurant

server, among other jobs. (Tr. 173-174).

In a function report submitted in July 2014, plaintiff said that she could not work because of severe anxiety with PTSD and panic attacks. She had chronic pain and her right arm went numb. She said she tried to cook and clean. It was hard for her to carry and lift because she had a bad knee, wrist, neck, and back. (Tr. 192-199).

In a later report, she said that she left her last job "to get away from abuse after getting an O.P. [order of protection] on my ex." (Tr. 230).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in May 2017. (Tr. 32).

Plaintiff lived with her boyfriend and his mother. (Tr. 38). She fell on ice in a parking lot in the same month that she applied for disability. (Tr. 39).

The ALJ asked her how her physical problems affected her ability to work. She said that she had "severe pain on a daily basis." She had pain in her neck and shoulder since she fell. Her doctor tried acupuncture, trigger point injections, manipulations, and medications. She had chronic headaches from the pain in her neck. She had pain and muscle spasms in her low back. She had depression and anxiety. She had panic attacks. She said that, without Xanax, she would not be able to leave the house. Her family doctor treated her mental health problems. She had been on Prozac and Xanax for six years. (Tr. 43-47).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which contained more limitations than the written RFC assessment. The

VE testified that this person could not do plaintiff's past work, but she could do other jobs such as housekeeper, assembler, and inspector. If she were to be off-task for 20% of the workday or absent from work more than one day a month, she would be unemployable. (Tr. 58-62).

### 3. Relevant Medical Records

Plaintiff first sought medical attention for pain on June 10, 2013. She went to a hospital in Peoria, Illinois. She said that she had recently been released from jail and needed a refill of her anxiety medication. She complained of low back pain resulting from being pushed by her "ex" and falling on a can of food that was on the couch. This occurred before she went to jail. She also complained of right knee pain from an injury that happened when she was nineteen years old. On exam, she had a localized area of pain in her back above the iliac crest. Lumbar range of motion was full and there was no vertebral bony tenderness. The ER doctor declined to prescribe any medication for her and offered to assist her with getting an appointment to be seen in a clinic for primary healthcare, but she refused. (Tr. 393-397).

The next day, plaintiff was seen by an advanced practice nurse in Dr. Boley's office. Dr. Boley was her primary care physician. She had been in jail for a DUI from March 7 to June 7, 2013. She complained of anxiety and was prescribed medication. There was no mention of back pain. She returned in July 2013 for a follow-up on anxiety. At this visit, she complained of low back pain caused by being shoved and landing on a can. The APN prescribed Cyclobenzaprine (Flexeril). (Tr. 307-310). Dr. Boley saw plaintiff in October 2013. He noted that

lumbar x-rays and MRI were normal, so there was no reason for anything stronger than over-the-counter pain medication. He was going to wean her off Hydrocodone and recommended physical therapy. (Tr. 315-316). It is unclear who had prescribed the Hydrocodone for her.

Plaintiff went to the emergency room on March 26, 2014, after falling getting out of an SUV the previous evening. She complained of pain in her wrists, shoulders, and buttocks. She denied head injury or loss of consciousness. She had a normal range of motion in the shoulders and wrists, and no tenderness in either wrist. Her head was atraumatic. She was able to ambulate without difficulty. She was prescribed Norco (Hydrocodone-acetaminophen) and told to follow up with Dr. Boley. (Tr. 443-448). She returned to the emergency room a week later, stating that she missed her follow-up doctor's appointment. She had gone to a "prompt care" the day before and had been given a prescription for Prednisone. X-rays taken there showed no acute abnormality. She had a normal range of motion of the neck. She complained of pain in the lumbar spine. The lumbar range of motion was normal with no muscle spasms. She had tenderness to palpation over the lower thoracic and lumbar spine. Sensation was intact, and she had full and equal strength in the upper and lower extremities. Her gait was steady. She was given a shot of Toradol and told to follow-up with her primary care physician. She was prescribed Etodolac, a nonsteroidal anti-inflammatory drug. (Tr. 456-465).

Plaintiff saw Dr. Boley on April 17, 2014, for back pain. On exam, she had decreased range of motion, tenderness, and pain in the cervical, thoracic, and

7

lumbar spine. Dr. Boley stated that he was very reluctant to give her pain medication because she had a history of narcotic abuse. He prescribed Baclofen, a muscle relaxer, and stated, "No further pain meds are required." He recommended physical therapy. (Tr. 269-270).

Plaintiff began seeing a new primary care provider, Dr. Link, on May 30, 2014. She told him that she had anxiety and panic attacks. She also complained of "widespread chronic pain." She said that her chart was labelled as high risk for narcotics because her boyfriend stole her medications one time. On exam, she had "multiple tender points upper and lower." The diagnoses were depression with anxiety and fibromyalgia syndrome. Dr. Link prescribed Norco and Elavil for fibromyalgia. (Tr. 482-485). She returned on July 1, 2014. She said she had a "whiplash injury" in March. She had seen a chiropractor once or twice a week for three months and was improved. She had an EMG because she complained of numbness in her fingers. That study was normal. Physical and psychiatric exams were normal. Dr. Link questioned whether the numbness in her right arm could be a manifestation of fibromyalgia. He refilled her prescription for Norco, but also prescribed Nortriptyline (an antidepressant) which she was to take nightly to "try to minimize opiate use." (Tr. 480-481).

Plaintiff was treated at Prairie Spine & Pain Institute for complaints of neck pain and numbness in her hands from November 2014 to January 2016. (Tr. 568-693). She filled out a questionnaire in November 2014 in which she indicated that she was making a legal claim regarding her injuries, that she could lift light to medium objects, and that she could do "most of [her] usual work but no more."

8

(Tr. 644). She was treated with trigger point injections, physical therapy, and medications. A cervical MRI showed "degenerative disc disease most pronounced at C5-C6 and C6-C7." (Tr. 607). In December 2014, it was noted that she "is making quite a bit of progress in physical therapy." (Tr. 617). In January 2015, Dr. Kube noted that the MRI showed a small annular tear at C6-7 that did not appear to be compressing the spinal cord. He ordered a nerve conduction study. (Tr. 597). Contrary to what she said in the emergency room the day after the fall, she told the doctor who did the nerve conduction study that she hit her head when she fell in March 2014 and realized within twenty-four hours that she had a concussion. (Tr. 584). She also told Dr. Kube that she hit her head. (Tr. 683). The study showed normal nerve conduction with no evidence of cervical radiculopathy. (Tr. 589). Dr. Kube concluded that she did not need surgery or epidural injections. He recommended chronic pain management. (Tr. 576).

Dr. Vittal Chapa examined plaintiff at the request of the agency in January 2015. The examination was normal. She had a full range of motion of the cervical and lumbar spine with intact sensation and no evidence of cervical radiculopathy. (Tr. 562-564).

Plaintiff began receiving primary healthcare from Benton Community Healthcare in September 2015. She was treated for anxiety, depression, back pain, and neck pain. In early October 2015, she had a normal gait and normal cervical and lumbar spine. (Tr. 754-758). About two weeks later, she requested an increase in pain medications. She was told that "she needs to see pain management for further treatment of chronic pain." She was referred to Dr.

9

Chipman. (Tr. 749-753).

Plaintiff was treated by Michael Chipman, D.O., for pain in her neck and upper, middle and lower back. She saw him seven times between January 2015 and May 2016. (Tr. 704-738). He treated her with medication, including Norco, and osteopathic manipulations. In April 2016, he noted that her pain was "now steady and improving" and she was able to do more of her activities. (Tr. 714). In May 2016, "pertinent negatives" included decreased mobility, muscle atrophy, and tenderness. (Tr. 704).

The next record of a visit with Dr. Chipman is dated December 13, 2016. (Tr. 765-769). She complained of pain in her upper back and left shoulder with no radiation. It occurred intermittently. He treated her with osteopathic manipulation, which improved her somatic dysfunction.[3] He prescribed Norco and a muscle relaxer.

Plaintiff's insurance for DIB ended as of December 31, 2016.

Plaintiff saw Dr. Chipman once a month from January through March 2017. (Tr. 770-784). In February, he noted that she had pain in her neck, left shoulder, upper back and lower back. The problem was worsening and occurred persistently. (Tr. 775).

4.  **Dr. Chipman's Opinion**

Dr. Chipman completed a form entitled Medical Source Document – Physical Capacity in May 2017. (Tr. 785). He said that plaintiff's diagnoses were chronic

---

[3] In osteopathic medicine, somatic dysfunction is a "defect in structure and/or function, which can be diagnosed by identifying tenderness, asymmetry, restricted motion, and tissue texture changes." https://medical-dictionary.thefreedictionary.com/Somatic+dysfunction, visited on June 14, 2019.

back pain, anxiety, and cervicogenic headaches.[4]  Her impairments had lasted for three years and her prognosis was "Limited-currently working on maintenance." He said that the cumulative effect of her problems would limit her to working for only four hours per day and she would be likely to miss work more than three times per month.  She had only a "slight limitation" in ability to deal with work stress.  She was able to sit for a total of eight hours and to stand/walk for a total of four hours in an eight-hour workday.   She was able to frequently lift up to ten pounds and occasionally lift up to twenty pounds.  The last question asked the doctor to list "any other limitations (e.g. medication problems, breathing, pain, fatigue, etc.) that would affect your patient's ability to work/sustain an 8-hour day."  Dr. Chipman left the answer blank.

## Analysis

Although neither party mentions it, there is a discrepancy between the RFC assessment in the ALJ's decision and the hypothetical question posed to the VE at the hearing.  The question posed to the VE included limitations that did not appear in the written decision.  The RFC assessment in the written decision limited plaintiff to work at the light exertional level, with nonexertional physical limitations consisting of (1) no climbing of ladders, ropes, or scaffolds; (2) only occasional climbing of ramps and stairs; and (3) occasional balancing, stooping, kneeling, crouching, and crawling.   The question posed to the VE included those limitations, with these additions:

---

[4] "Cervicogenic headache is referred pain (pain perceived as occurring in a part of the body other than its true source) perceived in the head from a source in the neck." https://americanmigrainefoundation.org/resource-library/cervicogenic-headache/, visited on June 17, 2019.

>    1.  frequent bilateral reaching in all directions and frequent bilateral handling and fingering; and
>
>    2.  understanding, remembering and carrying out instructions for simple tasks on a sustained basis in a work setting requiring no more than occasional interaction with co-workers, supervisors and the public.

The VE responded that a person with this RFC would be able to do the light, unskilled jobs of housekeeper, assembler, and inspector. (Tr. 58-62). In his written decision, the ALJ found that plaintiff was able to do those jobs. (Tr. 26).

The doctrine of harmless error applies in this case. An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). In *McKinzey*, the ALJ erred in not discussing the opinion of a state agency physician. However, the Seventh Circuit held that the error was harmless because "no reasonable ALJ would reach a contrary decision on remand" based on that opinion. *McKinzey, Ibid.* In view of the VE's testimony here, no reasonable ALJ would reach a contrary result unless the record demonstrates that plaintiff cannot meet the demands of the hypothetical question posed to the VE, rather than the RFC assessment contained in the written decision.

Plaintiff first argues that the ALJ erred by not explaining how the RFC assessment accommodated her fibromyalgia, even though he found fibromyalgia to be a severe impairment at step 2. At step 3, the ALJ stated

> There is no specific listing for fibromyalgia. (See SSR 12-2p). The undersigned is aware that it generally causes fatigue and widespread pain in the joints, muscles, tendons, or nearby soft tissues. However, the evidence of record fails to show that the claimant's fibromyalgia related symptoms increases the severity of her other medically determinable severe impairments to an extent that the combination of impairments meets the requirements of a listing.

(Tr. 21).

In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). Plaintiff points to no fibromyalgia related evidence that she claims was ignored by the ALJ,

In fact, there is very little mention of fibromyalgia in the medical records. Dr. Link, who saw plaintiff twice, was the only doctor to mention fibromyalgia. He noted "multiple tender points upper and lower" and referred her for nerve conduction studies because she complained of numbness in her fingers. Those studies were normal. In June 2014, Dr. Link questioned whether the numbness in her right arm could be a manifestation of fibromyalgia. (Tr. 480-485). The medical records do not suggest that plaintiff suffered any other symptoms that were caused by fibromyalgia. And, as the ALJ noted, the record contains notes of numerous normal range of motion and sensory examinations, both by treating doctors and by examining consultant Dr. Chapa. Plaintiff does not identify any specific symptom allegedly caused by her fibromyalgia, and she does not argue that fibromyalgia causes any specific limitations that are not accommodated by the RFC assessment in the written decision or the more expansive hypothetical question posed to the VE. Her first point is denied.

Plaintiff next argues that the ALJ failed to adequately assess the opinion evidence. First, to the extent that plaintiff is suggesting that the RFC assessment must track a medical opinion, she is incorrect. The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R.

§404.1527(d)(2). The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Plaintiff acknowledges that the ALJ found that plaintiff was more limited than the state agency reviewers indicated. He assessed additional limitations based on the MRI finding of neuroforaminal stenosis of the cervical spine and a finding of some upper extremity weakness on one exam. She argues that the ALJ erred in interpreting the MRI results himself, but he was merely quoting the report of the MRI. See, Tr. 607. And, Dr. Kube noted that the MRI showed a small annular tear at C6-7 that did not appear to be compressing the spinal cord. (Tr. 597). The ALJ was entitled to rely on Dr. Kube's interpretation of the study.

Plaintiff argues that the ALJ should have afforded more weight to Dr. Chipman's opinion.

Dr. Chipman treated plaintiff, but the ALJ was not required to fully credit his opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained in detail why he gave "little weight" to Dr. Chipman's opinion, noting the ways in which it was unsupported by or conflicted with the medical evidence. He contrasted Dr. Chipman's opinion that plaintiff was able to work only four hours a day and would miss work three days per month with the doctor's own notes of generally unremarkable physical exams. He noted that Dr. Chipman prescribed only conservative pain control measures, and that the records indicate that plaintiff's pain level stabilized with manipulative treatments, Norco, and Baclofen. He also noted that medical records from other providers showed that plaintiff's symptoms improved with treatment. (Tr. 23-24).

Plaintiff's argument ignores much of the ALJ's explanation. Rather, she complains that the ALJ did not cite a medical source as authority for his conclusion that the conservative measures offered by Dr. Chipman suggest that he was not observing evidence of work preclusive limitations. However, this argument ignores the ALJ's observation that Dr. Chipman himself recorded largely unremarkable findings on physical exam.

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that the ALJ easily met the minimal articulation standard here.

Lastly, plaintiff challenges the ALJ's finding that her subjective complaints were not supported by the record. Her argument on this point consists of the following two paragraphs:

> Here, the ALJ cited to i) Plaintiff's lack of treatment prior to March 2014 and ii) subsequent progress notes that the ALJ concluded showed Plaintiff's physicians "managing her reported symptoms with conservative pain measures, which suggests they likely have not observed evidence of debilitating symptoms." T 23. The ALJ stated that Dr. Chipman's later notes show stability with manipulative treatments (T 23), but Dr. Chapman [sic] still noted persistent moderate-severe pain (T 770). In fact, [in] March 14, 2017, Plaintiff's pain was severe. T 780.
>
> Finally, even though the ALJ highlighted Plaintiff's lesser treatment from 2011 to 2013, [t]he ALJ is still required to assess disability from 2014 to 2016 (the date last insured—T 17). If the Court finds the ALJ's decision as to the period from 2011 to 2013 to be substantially supported, the Court should still question the validity of the ALJ's decision as to the period from 2014 to 2016.

Doc. 17, pp. 15-16.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p was republished in October 2017 and can be found at 2017 WL 5180304. SSR 16-3p became effective on March 28, 2016 and should be applied by the ALJ in any case decided on or after that date. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." *Ibid.*, at *2. "Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." *Ibid.*, at *11. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying

17

solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for his findings in this area. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

Plaintiff completely ignores the ALJ's explanation for discounting her subjective claims. As required by § 404.1529 and SSR 16-3p, he considered the objective medical evidence, including x-rays and MRI; the course of her treatment; the findings of the various doctors on physical exams; her daily activities; and the medical opinions. Plaintiff does not argue that the ALJ erred in his consideration of any of these factors except the medical opinions, and that point has already been discussed above. Plaintiff does not argue that the ALJ was inaccurate in noting the lack of treatment for physical complaints before 2014 although she claimed to have become totally disabled in May 2011. And, her point about Dr. Chipman's note from March 2017 is irrelevant because her date last insured was December 31, 2016. Furthermore, in February 2017, after the date last insured, Dr. Chipman noted that her pain was worsening. (Tr. 775). In contrast, in April 2016, Dr. Chipman said her pain was "now steady and improving" and she was able to do more of her activities. (Tr. 714). In short, the ALJ's conclusion as to the accuracy of plaintiff's statements was supported by the evidence and was not "patently wrong;" it must therefore be upheld. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th

Cir. 2007).

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** June 19, 2019.

*Donald Wilkerson*

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**